**06-4211; 06-4296 (CON); 06-4339 (CON); 06-4436 (CON); 06-4437 (CON); 06-4438 (CON); 06-4447 (CON);**

# United States Court of Appeals For the Third Circuit

UNITED STATES,

*Plaintiff-Appellee,*

- v. -

DARIUS FULLMER, ANDREW STEPANIAN, KEVIN KJONAAS, JOSHUA HARPER, LAUREN GAZZOLA, STOP HUNTINDON ANIMAL CRUELTY, INC., and JACOB CONROY,

*Defendant-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRCIT OF NEW JERSEY

**BRIEF OF AMICI CURIAE CENTER FOR CONSTITUTIONAL RIGHTS AND FIRST AMENDMENT LAYWERS ASSOCIATION IN SUPPORT OF APPELLANTS' JOINT PETITION FOR REHEARING EN BANC**

Matthew Strugar
Rachel Meeropol
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6432
*Attorneys for Amici Curiae*

## <u>CORPORATE DISLCOSURE STATEMENT</u>

Pursuant to Fed. App. R. 26.1 and Local App. R. 26.1.1, *Amici Curiae* herby certify they have no parent corporations and they have not issued any shares of stock to any publicly held company.

<u>/s/ Matthew Strugar</u>
Matthew Strugar
Rachel Meeropol
CENTER FOR
CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6432

*Attorneys for Amici Curiae*

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................................................i

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES ...........................................................................................iii

STATEMENT OF INTEREST OF AMICI CURIAE AND SUMMARY OF
ARGUMENT ..............................................................................................................1

ARGUMENT ..............................................................................................................2

I.      The Panel's Application of the True Threats Doctrine to Publicly
        Disseminated Speech Conflicts with Supreme Court Precedent and Leaves
        Little Guidance to Speakers on the Legality of Menacing Public Speech.........................2

II.     The Panel's Use of Historical Rather than Actual Context is in Error .............................5

III.    The Panel's Intent Standard for True Threats Conflicts with Supreme Court
        Precedent and the First Amendment ...............................................................12

CONCLUSION..........................................................................................................16

APPENDIX..............................................................................................................18

CERTIFICATE OF BAR MEMBERSHIP..................................................................................20

CERTIFICATE OF COMPLIANCE.........................................................................................21

CERTIFICATION PURSUANT TO LOCAL APPELLATE RULE 31.1(c) .............................22

CERTIFICATION OF SERVICE.............................................................................................23

# TABLE OF AUTHORITIES

## Cases

*Brandenburg v. Ohio*, 395 U.S. 444 (1969)............................................................ 3, 5

*Commonwealth v. Gazzola*, 17 Mass. L. Rep. 308, 2004 Mass. Super. LEXIS 28 (Sup. Ct. 2004) ...................................................................................................... 6, 7

*Greenhut v. Hand*, 996 F. Supp. 372 (D.N.J. 1998) ................................................. 4

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)..................................... 4, 7

*Planned Parenthood of the Columbia/Wilamette, Inc. v. American Coalition of Life Activists*, 290 F.3d 1058 (9th Cir. 2002)............................................................ 9, 10

*Rogers v. United States.*, 422 U.S. 35 (1975) ........................................................ 16

*Sheehan v. Gregoire*, 272 F. Supp. 2d 1135 (W. D. Wash. 2003)........................... 7

*United States  v. Cassel*, 408 F.3d 622 (9th Cir. 2005)........................................... 14

*United States v. Carmichael*, 326 F. Supp. 2d 1267 (M.D. Ala. 2004) ............... 7, 10

*United States v. D'Amario*, 330 Fed. Appx. 409 (3d Cir. 2009).............................. 4

*United States v. Fuller*, 387 F.3d 643 (7th Cir. 2004) ............................................ 14

*United States v. Fullmer*, 584 F.3d 132 (3d Cir. 2009) ................................... *passim*

*United States v. Himelwright*, 42 F.3d 777 (3d Cir. 1994) ..................................... 15

*United States v. Kelner*, 534 F.2d 1020 (2d Cir. 1976) .......................................... 11

*United States v. Kosma*, 951 F.2d 549 (3d Cir. 1991) .............................................. 4

*United States v. Mintz,* 77 Fed. Appx. 115 (3d Cir. 2003)........................................ 4

*United States v. Parr*, 545 F.3d 491 (7th Cir. 2008)............................................... 13

*United States v. Richards*, 271 Fed. Appx. 174 (3d Cir. 2008) ................................ 5

*United States v. White*, 638 F. Supp. 2d 935 (N.D. Ill. 2009).................................. 10

*United States v. Zavrel*, 384 F.3d 130 (3d Cir. 2004)........................................ 4, 15

*Virginia v. Black*, 538 U.S. 343 (2003)................................................................................*passim*

*Watts v. United States* , 394 U.S. 705 (1969) ....................................................................*passim*


**Other Authorities**

Paul T. Crane, *"True Threats" and the Issue of Intent*, 92 VA L. REV. 1225 (2006)................ 13

Jennifer Elrod, *Expressive Activity, True Threats, and the First Amendment*,
  36 CONN. L. REV. 541 (2004) .............................................................................................. 10

Jennifer Rothman, *Freedom of Speech and True Threats*,
  25 HARV. J.L. & PUB. POL'Y 283 (2002)........................................................................2-3, 6

Eugene Volokh, *Crime-Facilitating Speech*, 57 STAN. L. REV. 1095 (2005)............................ 8

## STATEMENT OF INTEREST OF AMICI CURIAE
## AND SUMMARY OF ARGUMENT

Proposed *amici* support Appellants' joint petition for rehearing and agree that the issues raised in Appellants' brief warrant *en banc* review.  We write separately to highlight the profound and disturbing implications of the Panel's application of the true threats doctrine.  As listed in the appendix, *amici*—the Center for Constitutional Rights and the First Amendment Lawyers Association—are non-profit civil rights and civil liberties organizations. *Amici* have received consent from all parties to submit this brief.

*En banc* review is essential to address substantial questions raised by the Panel opinion regarding when and how speech can be criminalized. First, the Panel's failure to distinguish menacing public speech from private threats serves as an end-run around the incitement doctrine. Second, the Panel criminalizes an enormous amount of speech and advocacy by relying on a broad historical context to inform its true threats analysis. Third, the Panel appears to apply an intent standard to true threats that results in a negligence standard for speech crimes.

## ARGUMENT

**I.    The Panel's Application of the True Threats Doctrine to Publicly Disseminated Speech Conflicts with Supreme Court Precedent and Leaves Little Guidance to Speakers on the Legality of Menacing Public Speech**

The Panel acknowledged that much of Appellants' speech and advocacy, in itself, was protected by the First Amendment.  Still, the majority held that Appellants' "speeches, protests and web postings," could be criminalized as "implied threats" given the broad historical context of one act of violence by animal rights activists in other countries, and acts of property destruction in this country. *United States v. Fullmer*, 584 F.3d 132, 156 (3d Cir. 2009).  This incredibly broad holding erroneously punishes publicly disseminated menacing speech pursuant to the true threats doctrine, despite clear Supreme Court precedent protecting such speech under the incitement standard. This Court should grant rehearing to determine and explain how the true threats doctrine applies to publicly disseminated speech and how the true threats doctrine interacts with the incitement doctrine.

Unlike incitement, the true threats doctrine has developed through cases involving one-on-one communication—usually face-to-face conversations, telephone calls, or letters. Speech of this nature can be proscribed, because controlling private threats does little or nothing to endanger the value of robust debate underlying the First Amendment. Jennifer Rothman, *Freedom of Speech*

2

*and True Threats*, 25 HARV. J.L. & PUB. POL'Y 283, 290-94 (2002) (compiling

justifications and sources in support of restricting threats). Punishing public

speech, even menacing public speech, however, does affect debate, and thus must

be carefully circumscribed. *Id.* at 293-94 (compiling politically valuable uses of

coercive and intimidating speech).

As a plurality of the Supreme Court recognized in *Virginia v. Black*, 538

U.S. 343, 366 (2003), speech that is almost certainly protected when it occurs at a

public event may be proscribed as a true threat when it occurs in private, and is

directed at an individual, with an intent to intimidate that individual. Thus in

*Black* the Court distinguished the protected act of burning a cross at a KKK rally

from the threatening act of burning a cross on a neighbor's lawn. *Id.* at 366.

This distinction is also apparent in other Supreme Court cases protecting

menacing public speech. Clarence Brandenburg, a Ku Klux Klan leader, spoke to

a gathering of Klansmen about the need for "revengeance" against the President,

Congress, and the Supreme Court, and others at the rally shouted chants

including "bury the niggers." *Brandenburg v. Ohio*, 395 U.S. 444, 446, n.1

(1969). The Supreme Court found this speech protected by the First Amendment.

*Id.* at 449. Robert Watts, a young draftee during the Vietnam War, told a crowd

of anti-war protesters that, if drafted, he would "get [the President] in [his]

sights." *Watts v. United States* , 394 U.S. 705, 706 (1969). The Court found his

speech was not a true threat but rather political hyperbole protected by the First Amendment. *Id.* at 708. Charles Evers, a NAACP field organizer in segregated Mississippi during a boycott of white-owned businesses, told a gathering, "If we catch any of you going in any of them racist stores, we're gonna break your damn neck." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 902 (1982). The Court found Evers' speech not a true threat, and protected by the First Amendment. *Id.* at 928 n.71, 929. In each case, the Court found public speech, even that which explicitly threatens, was protected by the First Amendment because it did not amount to incitement.

Prior to the Panel decision in this case, this Court's true threats cases too dealt almost entirely with private threats. *See, e.g.*, *United States v. Kosma*, 951 F.2d 549, 550, 557 (3d Cir. 1991) (multiple letters sent directly to the President threatening "21 guns are going to put bullets thru your heart & brains," constituted a true threat); *United States v. Zavrel*, 384 F.3d 130 (3d Cir. 2004) (mailing a white powdery substance to the President and local officials during the 2001 anthrax scare constituted a true threat); *United States v. D'Amario*, 330 Fed. Appx. 409, 411 (3d Cir. 2009) (mailing threatening memorandum to district court); *United States v. Mintz*, 77 Fed. Appx. 115, 116 (3d Cir. 2003) (same). The same is true for the threats cases in this Circuit's district courts. See, e.g., *Greenhut v. Hand*, 996 F. Supp. 372, 374 (D.N.J. 1998) (telephone messages

threatening bombings and death). These cases must be contrasted with menacing public speech. *See United States v. Richards*, 271 Fed. Appx. 174, 177-78 (3d Cir. 2008) (public statement by man with mental disabilities that he will "put bullets into" the former First Lady not a true threat).

There is no precedent in this Circuit, or in the Supreme Court, for punishing menacing public speech as a true threat when that speech does not meet *Brandenburg's* incitement standard. Yet that is exactly what the Panel did. The court should grant rehearing *en banc* to correct this evisceration of a significant aspect of Freedom of Speech.

## II.    The Panel's Use of Historical Rather than Actual Context is in Error

In ignoring the well-established distinction between publicly menacing speech and true private threats, the Panel instead relied on Appellants' use of "past incidents to instill fear in future targets" to find Appellants' speech and advocacy punishable as a true threat. 584 F.3d at 156. Specifically, the Panel stated that "SHAC displayed placards with photos of Brian Cass after his beating, with his injuries highlighted in red, at protests," *id.*, that Appellants "attributed the quick exit of some targets… to the past experience of employees at [other] companies," *id.*, and that Gazzola "threaten[ed] to burn down [Robert] Harper's house and warn[ed] him that the police cannot protect him." *Id*. at 157.

Even taking the Panel's version of the facts at face value, Appellants' speech does not fall outside the protection of the First Amendment.[1] Displaying a photograph of Brian Cass at a demonstration can inform the listener of potential danger from others outside the speaker's control. *See* 25 HARV. J.L. & PUB. POL'Y at 321-27 (evaluating the benefit of protecting warning threats); *see also* Martin Luther King Jr., LETTER FROM A BIRMINGHAM JAIL (Harper S.F. ed., 1994) (warning whites of violence from black nationalists if they blocked King's nonviolent demands). Similarly, the "what goes around comes around; burn this house to the ground" chant is comparable to Robert Watts' promise to "get [the President] into my sights" 394 U.S. at 706. That it was not taken or intended as a true threat is evidenced by the Police present for the demonstration, who "stood

---

[1] The Panel gets a number of these facts wrong. Appellants' petition details the lack of support in the record for the Panel's claim that Appellants displayed at protests a placard depicting injuries to Brian Cass. *See Appellants' Joint Petition for Rehearing by the Panel or En Banc*, at 12 n.5. Similarly, the claim Gazzola threatened to burn Robert Harper's house down is a mischaracterization. It is likely the Panel is referring to an August 9, 2002 protest outside Robert Harper's home which featured a call and response chant where Ms. Gazzola said "What goes around comes around" and the group answered "Burn this house to the ground." 584 F.3d at 157 n.11; *Commonwealth v. Gazzola*, 17 Mass. L. Rep. 308, 2004 Mass. Super. LEXIS 28, *15 (Sup. Ct. 2004). According to the Massachusetts court that first considered (and upheld) the legality of this protest,"[t]he chant, repeated four times, was used during a single ten-second time period in a demonstration which lasted more than half an hour…. When those words were uttered, some members of the group were smiling or laughing, and police officers stood nearby, seemingly unconcerned." *Id*. at *15. The fact that the Massachusetts court had such a different interpretation of the facts and their application to the First Amendment's protections underlines the need for review here.

nearby, seemingly unconcerned." 2004 Mass. Super. LEXIS 28 at *15. And

Gazzola's statement that the police could not protect Mr. Harper is nearly

identical to a statement Charles Evers made in *Claiborne*, when he said at one

protest that the sheriff would not be able to protect those who violated the

boycott. 458 U.S. at 902.

Even more problematic is the Panel's broad holding that, in context, "the

speeches, protests, and web postings" were *all* 'true threats,' because they were

all tools to further Appellants' advocacy.  584 F.3d at 156. Specifically, the Panel

focuses on the posting of home addresses and telephone numbers, (*see e.g.*, *id.* at

138, 140, 142-43, 145, 146, 148 n.6, 155) and appears to rule that such

information is beyond the protection of the First Amendment, but explains

neither why nor how. *Id*. at 155 ("we find that the posts that ... disseminate the

personal information of individuals employed by Huntingdon and affiliated

companies are more problematic").

Posting personal information is not a true threat. *See, e.g., United States v.*

*Carmichael*, 326 F. Supp. 2d 1267, 1280-89 (M.D. Ala. 2004) (rejecting the

government's request for an injunction ordering the defendant to take down

website containing the names and addresses of government informants and

agents); *see also, Sheehan v. Gregoire*, 272 F. Supp. 2d 1135, 1146 (W. D. Wash.

2003) (revealing personal information about law enforcement officers on website

is protected by First Amendment). There is nothing threatening about an address
or telephone number on its face. Rather, the information is usually publicly
available and has obvious constitutional uses for individuals who, like
Appellants, organize protests at individuals' homes. See Eugene Volokh, *Crime-
Facilitating Speech*, 57 STAN. L. REV. 1095, 1142-43 (2005) (discussing how the
publishing of names and addresses can help people evaluate and participate in
public debate, as well as facilitate lawful remonstrance and social ostracism).

In each instance, the Panel relied on the *context* of one act of violence and
several acts of property destruction to transform protected public speech,
including some speech that is rude or menacing, into true threats. The one assault
at issue took place in England in 2001.[2] 584 F.3d at 138. The Panel also
considered a wide variety of crimes that took place across the country. *Id*. at 139-
43. This use of context is not supported by precedent, and knows no limit.

Context is important to Free Speech analysis. For example, in *Watts* the
Court held that "[t]aken in context" Watts' words were not a true threat. 394 U.S.
at 708. But there, the context in question was the speaker's immediate
surrounding and the reaction of the listeners—a speech at an anti-war rally where
the listeners' response was laughter. *Id*. at 707. Similarly, in *Black* the plurality
notes the importance of context, directing courts to consider, for example,

---

[2] Notably, the victim of that assault was also the prosecution's lead witness.

whether a cross is burned on a neighbor's land with or without permission. 538

U.S. at 366. The Court did not include in its exploration of proper context the

Klan's brutal history of following cross burnings with violence. *Id*. That view

was advocated by Justice Thomas, but it only garnered his vote. *Id.* at 388-400

(Thomas, J., dissenting).

By relying so heavily on the historical, rather than actual, context of

Appellants' speeches, the Panel decision expands—without discussion or

citation—upon an already controversial opinion.  In *Planned Parenthood of the*

*Columbia/Wilamette, Inc. v. American Coalition of Life Activists*, 290 F.3d 1058

(9th Cir. 2002) a 6-5 split *en banc* panel of the Ninth Circuit Court of Appeals

found a true threat where anti-abortion activists published "wanted" posters of

abortion practitioners, and a website called the "Nuremberg Files," with lines

drawn through the names of murdered or wounded doctors. 290 F.3d at 1062-63.

The Ninth Circuit majority held the speech proscribable as a true threat due to

three prior murders of abortion practitioners immediately following

dissemination of identical posters. *Id.* at 1085.

The use of historical context in *Planned Parenthood* is narrow and exact:

three times a specific poster was followed by a murder, thus creation of a new

poster can be easily understood as a threat that the targeted doctor would be

murdered. The Panel here uses context in a far broader and more problematic

way: SHAC-UK's above-ground campaign to target Huntingdon directors

through a variety of lawful means also involved various illegal acts, including

property destruction, and was followed by one physical assault.  SHAC-USA's

campaign similarly marries lawful and unlawful actions, yet importantly,

included no violence.  Still, under the Panel's reasoning, all animal rights

campaigns that marry legal and illegal actions can be seen to imply the threat of

assault.

Moreover, even the much narrower *Planned Parenthood* decision has been

highly criticized by scholars. *See* Jennifer Elrod, *Expressive Activity, True*

*Threats, and the First Amendment*, 36 CONN. L. REV. 541, 584 n.253 (2004)

(compiling scholarly commentary). For this reason many courts have declined to

extend *Planned Parenthood's* rationale beyond its narrow factual context. *See,*

*e.g., Carmichael*, 326 F. Supp. 2d at 1284 (declining to extend Planned

Parenthood decision outside of the context of multiple murders following public

dissemination of personal information); *United States v. White*, 638 F. Supp. 2d

935, 948-49 (N.D. Ill. 2009) (same). Both the *Carmichael* and *White* courts

devoted substantial attention to the *Planned Parenthood* ruling before declining

to extend its rationale to a new set of facts. 326 F. Supp. 2d at 1282-89; 638 F.

Supp. 2d at 948-951. Here, after substantial briefing by both sides on the meaning

of *Planned Parenthood*, the Panel expanded that ruling, without explanation or

even citation, beyond the context of multiple murders, instead relying heavily on a physical assault in England years earlier. Such an expansion of this Circuit's First Amendment law should not happen tacitly.

While the Panel's opinion failed to properly consider and balance the impact of its broad true threats holding on First Amendment values and precedent, this does not mean it is impossible to punish true public threats consistent with constitutional concerns. When faced with the issue of publicly threatening speech, the Second Circuit employed a test that successfully balanced the need to protect against threats with the robust protections of the First Amendment. *United States v. Kelner*, 534 F.2d 1020 (2d Cir. 1976). Kelner was charged with threatening to assassinate Yasser Ararat when, prior to Arafat's visit, Kelner held a press conference in which he made a number of explicitly threatening statements, including "we are planning to assassinate Mr. Arafat." *Id*. at 1021.

Under the Second Circuit's test a proscribable "threat on its face and in the circumstances [must be] … so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." 534 F.2d at 1027. This heightened explicitness test for public threats allows the government to punish true threats while still protecting speech that uses "vituperative, abusive, and inexact" language. *Watts*,

394 U.S. at 708. Such a careful balance is necessary to protect against convictions based primarily on ideology or association.

### III.  The Panel's Intent Standard for True Threats Conflicts with Supreme Court Precedent and the First Amendment

Finally, the Panel's unreasoned application of a "reasonable listener" approach to the intent requirement for a true threat works in concert with its overly broad analysis of context to render vast swaths of advocacy and menacing public speech punishable.

The circuit courts are sharply divided on whether the government may criminalize speech based on an objective test focusing on what a "reasonable speaker" (or a "reasonable listener") would find threatening, or whether the government must show the speaker has a "subjective intent to threaten." The Panel did not explicitly address this issue, nor endorse either of these prevailing views, but rather seems to have relied on a determination that, in the home demonstrations at issue in this case, the homeowner's subjective fear was reasonable given his (again subjective) knowledge of past violence by animal rights activists. *See, e.g.,* 584 F.3d at 157 (holding Robert Harper's fear that protestors would act on threats was reasonable given assault on Brian Cass years earlier, in England).

The Supreme Court has largely left it to the lower courts to sort out the broad and unclear constitutional standards imposing criminal liability on

threatening speech. *See United States v. Parr*, 545 F.3d 491, 500 (7th Cir. 2008) *cert. denied* 129 S. Ct. 1984 (2009) (describing the Court's formulation of the true threat doctrine in *Black* as "unclear"); Paul T. Crane, *"True Threats" and the Issue of Intent*, 92 VA L. REV. 1225, 1252 (2006) ("the lack of clear guidance from the Supreme Court on this subject has fostered the proliferation of eclectic and contradictory standards").

In *Watts*, the first Supreme Court case to address true threats, the Court did not decide the question of requisite intent, but expressed "grave doubts" about the intent test developed in the D.C. Circuit that only required the speaker spoke "willingly." 394 U.S. at 708.

In *Black*, the only other Supreme Court case to address the intent issue, the Court defined true threats as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." 538 U.S. at 359. The Court elaborated its true threat definition by noting that, "intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the *intent* of placing the victim in fear of bodily harm or death." *Id.* at 360 (emphasis added).

Under the best reading of this language, "means to" modifies the entire phrase "communicate a serious expression of an intent to commit an act of

unlawful violence." In other words, the speaker *means* to threaten. *See, e.g., United States v. Cassel*, 408 F.3d 622, 633 (9th Cir. 2005) (holding that, in light of *Black*, "[w]e are [] bound to conclude that speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat").

Under the opposing view, the phrase "means to communicate" simply requires the utterance itself be knowing and not the result of a mistake, duress, or coercion. The second clause—"a serious expression of an intent to commit an act of unlawful violence"—is interpreted to mean a serious expression as determined under an objective, reasonable person standard. *See, e.g., United States v. Fuller*, 387 F.3d 643, 646 (7th Cir. 2004) ("a communication is a 'true threat' if a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm") (internal quotation omitted).

Depending on the standard applied, these two approaches lead to dramatically different outcomes and different restrictions on the content of pure speech. *Amici* submit the subjective intent to threaten standard is the more reasonable reading of *Black* and is more consistent with the values underlying the First Amendment.

This circuit's pre-*Black* threats cases adopted an objective reasonable speaker standard for true threats. *See, e.g., United States v. Himelwright*, 42 F.3d 777, 782 (3d Cir. 1994). But, unlike nearly all of the sister circuits, this court has not revisited its intent standard for threats in light of *Black*.

The closest this court came to a post-*Black* analysis of the intent standard for threats was in determining whether the true threat doctrine proscribes threats of immediate harm, or only threats of future harm. *United States v. Zavrel*, 384 F.3d 130 (3d Cir. 2004). In *Zavrel*, this court employed the objective reasonable listener standard in endorsing proscription of immediate as well as future harms. *Id*. at 136. *Zavrel* discussed neither the intent standard nor the *Black* decision. *Id.* at 136-37.

By focusing on the reaction of a hypothetical reasonable person, the objective approach discounts the speaker's First Amendment right to expression, even if that means using language which a reasonable person might find threatening. And by considering the reasonableness of the actual listener's reaction based on specific knowledge held by that individual, the Panel's approach would allow a third party to manufacture a threat, if, for example, a corporation targeted by animal rights activists spread rumors about violent acts by other advocates in other communities.

In either case, by disregarding the actual intent of the speaker, the test runs the risk of punishing crudely worded ideas. Speakers must be free to communicate ideas, even in ways reasonable person would consider abrasive or offensive, so long as the speaker does not intend to threaten. "In essence, the objective interpretation embodies a negligence standard, charging the defendant with responsibility for the effect of his statements on his listeners. . . . [W]e should be particularly wary of adopting such a standard for a statute that regulates pure speech… [as it] would have substantial costs in discouraging the uninhibited, robust, and wide-open debate that the First Amendment is intended to protect." *Rogers v. United States.*, 422 U.S. 35, 47-48 (1975) (Marshall, J., concurring). Any standard that makes the intent of the speaker irrelevant and puts the weight of criminal liability on the interpretation of a third party forces speakers with no intention to threaten anyone to undertake the impossible task of discerning how third parties may interpret their statements. The objective negligence standard, quite simply, chills speech. This Court should rehear this case to explicitly settle on an intent standard so speakers in the Third Circuit are on notice of how (and why) their speech can be criminalized.

## CONCLUSION

For the foregoing reasons, this Court should grant Appellants' Joint Petition for Rehearing and review the case below *en banc*.

16

Date: December 4, 2009
New York, New York

Respectfully Submitted,


 /s/ Matthew Strugar
Matthew Strugar
Rachel Meeropol
CENTER FOR
CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212)614-6432
*Attorneys for Amici Curiae*

# APPENDIX

The **Center for Constitutional Rights** ("CCR") is a national non-profit legal, educational, and advocacy organization dedicated to advancing and protecting the rights guaranteed by the United States Constitution and international law. CCR has actively protected the rights of marginalized political activists for over forty years and litigated historic First Amendment cases including *Dombrowski v. Pfister*, 380 U.S. 479 (1965), *Texas v. Johnson*, 491 U.S. 397 (1989), and *United States v. Eichman*, 496 U.S. 310 (1990).

The **First Amendment Lawyers Association** is a Nation-wide voluntary association of approximately 200 attorneys who substantially concentrate their practices on matters concerning freedom of expression. For nearly forty years, it has served as a forum for discussing and analyzing free speech matters and for formulating, planning, and monitoring free speech litigation. Its members have a keen interest in a wide range of free expression matters and in their sound adjudication by our courts.

<u>**Certification of Bar Membership**</u>

I, Matthew Strugar, certify that I am a member of the bar of this Court.

Date: December 4, 2009
New York, New York

Respectfully submitted,

<u>/s/ Matthew Strugar</u>
Matthew Strugar
Rachel Meeropol
CENTER FOR
CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6432

*Attorneys for Amici Curiae*

## <u>Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements</u>

I certify that this brief complies with the type-volume limitation of

Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,805 words,

excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

The brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced type face using

Microsoft Office Word 2003 in 14-point Times New Roman font.

Date: December 4, 2009
New York, New York

Respectfully submitted,

<u>/s/ Matthew Strugar</u>
Matthew Strugar
Rachel Meeropol
CENTER FOR
CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6432

*Attorneys for Amici Curiae*

## Certifications Pursuant to Local Appellate Rule 31.1(c)

I certify that this brief complies with L.A.R. 31.1(c) in that prior to it being filed by ECF the brief was scanned using Symantec AntiVirus version 10.1.5.5000, and no virus was detected. I further certify that the paper copies of this brief and the text of the PDF version of this brief filed electronically with the Court today are identical, except insofar as the paper copies contain physical signatures and the PDF version contains electronic signatures.

Date: December 4, 2009
New York, New York

Respectfully submitted,

/s/ Matthew Strugar
Matthew Strugar
Rachel Meeropol
CENTER FOR
CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6432

*Attorneys for Amici Curiae*

## Certification of Service Upon Counsel

I certify that on December 4, 2009 I served the foregoing Brief of

*Amici Curiae* on all parties listed below via this Court's ECF system and

additionally served one paper copy on counsel for the Appellee, the United

States, at the following address via regular U.S. mail, postage prepaid:

Glenn Moramarco, Esq.
Assistant United States Attorney
401 Market Street, 4th Floor
Camden, NJ 08101

Peter Goldberger, Esq.
Pamela A. Wilk, Esq.
50 Rittenhouse Place
Ardmore, PA 19003-2276

Andrew F. Erba, Esq.
Williams, Cuker & Berezofsky
Woodland Falls Corporate Center
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002-1163

Robert G. Stahl, Esq.
Laura K. Gasiorowski, Esq.
Law Offices of Rbt. G Stahl, LLC
220 St. Paul Street
Westfield, NJ 07090

Hal K. Haveson, Esq.
Haveson & Otis
194 Nassau Street
Princeton, NJ 08542

Paul J. Netznecker, Esq.
1420 Walnut St., Suite 911
Philadelphia, PA 19102

Robert A. Obler, Esq.
Bldg. 3D, Suite 200
3131 Princeton Pike
Lawrenceville, NJ 08684

H. Louis Sirkin, Esq.
Scott Ryan Nazzarine, Esq.
Sirkin, Kinsley & Nazzarine LLP
810 Sycamore St., Second Fl.
Cincinnati, OH 45202

Paul J. Hetznecker, Esq.
1420 Walnut St., Suite 911
Philadelphia, PA 19102

Date: December 4, 2009
New York, New York


Respectfully submitted,

/s/ Matthew Strugar
Matthew Strugar
Rachel Meeropol
CENTER FOR
CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6432

*Attorneys for Amici Curiae*